IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| LISA SWENSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 7:23-cv-00056-O |
| | § | |
| CLAY COUNTY MEMORIAL | § | |
| HOSPITAL, *et al*., | § | |
| | § | |
| Defendants. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Before the Court are Defendants Clay County Memorial Hospital's and Clay County Memorial Hospital Foundation's Opposed First Amended Motion to Compel Arbitration and Dismiss Litigation (As To Plaintiff's First Amended Complaint) (ECF No. 15); Plaintiff's Response (ECF No. 20); and Defendants' Reply (ECF No. 24). After considering the pleadings and applicable legal authorities, the undersigned **RECOMMENDS** that United States District Judge Reed O'Connor **GRANT** Defendants' Motion in **PART** and stay rather than dismiss the case.

**I.    BACKGROUND**

On September 11, 2006, Lisa Swenson ("Swenson") signed an arbitration clause on a "New Employee Record Sheet" ("NERS") provided by Clay County Memorial Hospital ("CCMH"). ECF No. 17 at 5. This arbitration clause referenced, and incorporated by reference, "the Dispute Resolution Agreement printed on the reverse side of this document." ECF No. 17 at 5. The parties dispute whether Swenson received or agreed to the Dispute Resolution Agreement referenced in the NERS (ECF No. 20 at 4), but a document titled, "Alternate Dispute Resolution Agreement," ("ADRA") proffered by Defendants states, in relevant part, "By signing this Agreement, the parties

are giving up any right they may have to sue each other. Any right to trial by jury or judicial appeal is expressly waived." ECF No. 17 at 6. The agreement also exclusively delegates "all disputes about the validity of this arbitration clause" to the arbitrator. *Id.* For the sake of clarity, the Court refers to the NERS and the ADRA collectively as the 2006 Agreement.

Years later, in March 2022, Swenson accepted the position of CEO of CCMH. ECF No. 20 at 5. "The terms and conditions of Swenson's employment are expressly set forth in a written employment agreement" that, according to Swenson, "expressly provides that it supersedes all prior written and oral agreements between [her] and Defendants." ECF No. 20 at 5. The Court refers to this agreement as the 2022 Agreement. The 2022 Agreement expressly provides that "This Agreement sets forth the entire agreement and supersedes all prior agreements, written or oral, between the parties," at least "with respect to the subject matter hereof." ECF No. 1 at 29. The 2022 Agreement does not include an arbitration clause. ECF No. 1 at 24-30.

Swenson alleges that she was wrongfully terminated from her employment on November 15, 2022. ECF No. 20 at 5. She subsequently sued Defendants. ECF No. 1. Defendants move to dismiss the litigation and compel arbitration under the Federal Arbitration Act ("FAA"), pointing to the 2006 Agreement. ECF Nos. 15-17; *see also* 9 U.S.C. § 1 *et seq*. In response, Swenson argues against arbitration, claiming that she did not accept the ADRA in 2006, that the 2006 Agreement required CCMH's signature (on the NERS) to be enforceable, and that the 2022 Agreement "contains a merger clause that expressly supersedes all prior and pre-existing contracts and agreements between [her] and Defendants." ECF No. 20 at 7-12. Defendants respond that Swenson's arguments about acceptance and signature are meritless and that the 2006 Agreement survived the 2022 Agreement because it did not relate to the same subject matter. ECF No. 24. On

2

August 29, 2023, Judge O'Connor referred Defendants' motion to compel arbitration to the undersigned. ECF No. 23. The Motion is now ripe for review.

## II.   LEGAL STANDARDS

Where applicable, the FAA "requires courts to enforce private arbitration agreements." *New Prime Inc. v. Oliveira*, ___ U.S. ___, 139 S. Ct. 532, 536 (2019). Courts in the Fifth Circuit use a two-step process when evaluating arbitration cases under the FAA. "[A] party is entitled to enforcement of an arbitration agreement where (1) there is a valid agreement to arbitrate and (2) the dispute falls within the scope of that agreement." *Flores v. BJ's Rest. Operations Co.*, No. 23-50038, 2023 WL 6533452, at *1 (5th Cir. 2023) (citing *Huckaba v. Ref-Chem, LP*, 892 F.3d 686, 688 (5th Cir. 2018)). The first step focuses on contract formation. *Archer and White Sales, Inc. v. Henry Schein, Inc.*, 935 F.3d 274, 278 (5th Cir. 2019), *cert. dismissed*, 592 U.S. 168 (2021). Courts address the first step using state contract law. *Flores,* 2023 WL 6533452, at *1. In Texas, forming a valid contract requires "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *Id*.

Sometimes, contracts delegate the issue of the validity of an arbitration clause to the arbitrator, and courts routinely honor that delegation. *See Henry Schein*, *Inc. v. Archer and White Sales, Inc.*, 586 U.S. __, 139 S. Ct. 524, 528 (2019) ("When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract."). But contract formation is somewhat distinct from contract validity, and formation matters remain the province of the court under the first step. *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 515 (5th Cir. 2019) ("We have consistently treated attacks on an arbitration agreement's existence as step one matters for courts, not arbitrators."); *Kubala v. Supreme Prod.*

3

*Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016) (finding that, in a case in which validity was delegated to the arbitrator, the court still performs "an analysis of contract formation—as it always does.").

When ruling on a motion to compel arbitration, the Court may consider "the pleadings and evidence on file." *Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 443-44 (N.D. Tex. 2019) (treating motion to compel arbitration like motion for summary judgment). It is the moving parties' burden to "prove the existence of an agreement to arbitrate by a preponderance of the evidence." *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012); *see also Amerigas USA, LLC v. Standard Cap. SA, Inc.*, No. 3:21-cv-0072-B, 2021 WL 5052658, at *2 (N.D. Tex. Nov. 1, 2021) (citing *Grant*, 469 F. App'x at 315). The movants must proffer "competent evidence showing the formation of an agreement to arbitrate." *Gallagher v. Vokey*, 860 F. App'x 354, 357-58 (5th Cir. 2021). The burden then "shifts to the party opposing arbitration to demonstrate either that the agreement is invalid or, at a minimum, to allege the dispute is outside of the agreement's scope." *Grant*, 469 F. App'x at 315.

If the Court concludes that whether the parties agreed to arbitrate their dispute is "in issue," then the Court should "proceed summarily to the trial thereof." *Gallagher*, 860 F. App'x at 357 (quoting 9 U.S.C. § 4). The Court bears in mind that "[t]he FAA expresses a strong national policy favoring arbitration of disputes, and all doubts concerning the arbitrability of claims should be resolved in favor of arbitration." *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002). However, "[w]hile the presence of an arbitration clause generally creates a presumption in favor of arbitration, the presumption disappears when the parties dispute the existence of a valid arbitration agreement." *O'Shaughnessy v. Young Living Essential Oils, L.C.*, 810 F. App'x 308, 311-12 (5th Cir. 2020) (internal citations and quotations omitted).

### III.     ANALYSIS

####      A.     The Court should deny Defendants' Motion to Compel Arbitration.

#####           1.     The FAA applies to the 2006 arbitration agreement.

The FAA only applies when there is a "written provision" within "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2; *see also New Prime*, ___ U.S. at ___, 139 S. Ct. at 537-38. The transaction must "in fact 'involv[e]' interstate commerce." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281 (1995) (alteration in original). The phrase "involving commerce" reaches broadly and "signals an intent to exercise Congress' commerce power to the full." *Id.* at 277; *see also* 9 U.S.C. § 1 (definition of "commerce").

Swenson does not dispute that the FAA applies to the 2006 arbitration agreement, which is written and contains an arbitration clause. ECF No. 17 at 5-6. No party argues that the case does not involve interstate commerce, and the Fifth Circuit has previously assumed that a management agreement involving a hospital involved interstate commerce. *See also Specialty Healthcare Mgmt.*, *Inc. v. St. Mary Parish Hosp.,* 220 F.3d 650, 654 (5th Cir. 2000) ("Assuming that the parties' management agreement involved 'commerce,' a broadly construed term under the FAA, the parties' agreement to arbitrate was governed by the FAA, a creature of federal law."). The Supreme Court also has explained that "[e]mployment contracts, except for those covering workers engaged in transportation, are covered by the FAA." *E.E.O.C. v. Waffle House*, 534 U.S. 279, 289 (2002).  Consequently, the FAA applies to the 2006 Agreement.

> **2.    In the 2006 Agreement, the parties agreed to arbitrate the dispute in question, but the arbitrator must decide if the 2022 Agreement superseded the 2006 Agreement.**
>
>> **a.    The arbitration agreement in the 2006 Agreement was validly formed.**
>
>>> **1.    Swenson accepted the 2006 Agreement.**

Arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Court applies state law contract principles in determining whether there is a valid arbitration agreement. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Flores*, 2023 WL 6533452, at *1. Because an arbitration agreement's validity "is a matter of contract," the moving party must show that the agreement "meets all of the requisite contract elements." *Huckaba*, 892 F.3d at 688-89. The parties do not dispute that Texas law applies to the contract. The only contract formation elements in dispute in this case are acceptance and execution, and based on the 2006 Agreement, the Court has no reason to believe the other formation elements under Texas law have not been met. ECF No. 17 at 6. Furthermore, because the contract is written, it is prima facie valid under the FAA. *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 341 (5th Cir. 2004). The contract also is authenticated by the declaration of Adrianna Romines, as required by Fed. R. Evid. 901. ECF No. 17 at 3-4; *Everest Indem. Ins. Co. v. Allied Int'l Emergency LLC*, No. 4:08-cv-678-Y, 2009 WL 2030421, at *2 (N.D. Tex. July 14, 2009).

Swenson argues that she did not accept the ADRA, so the Agreement was never formed. ECF No. 20 at 7-8. Swenson's argument is not persuasive. "Texas courts have consistently held that 'a party's signature on a written contract is strong evidence that the party unconditionally assented to its terms.'" *Gallagher*, 860 F. App'x at 358 (quoting *Bullock v. Am. Heart Ass'n*, 360 S.W.3d 661, 666 (Tex. App.—Dallas 2012, pet. denied)). Swenson's wet signature appears

underneath the arbitration clause on the NERS. ECF No. 17 at 5; ECF No. 24 at 3. This signature is strong evidence that Swenson unconditionally assented to the terms of the NERS. Moreover, Swenson admitted to signing the NERS. ECF No. 21 at 3-4 ("Although I recall signing the [NERS]…"). This is far from "unequivocally denying entering the contract" and "producing evidence sufficient to substantiate that allegation," which would make trial on this issue appropriate. *Soni v. Solera Holdings*, L.L.C., No. 21-10428, 2022 WL 1402046, at *3 (5th Cir. May 4, 2022).

Swenson accepted both the NERS and the ADRA. "When a signed arbitration agreement incorporates an unsigned writing by reference, the unsigned writing is enforceable as part of the agreement so long as the contract signed by the [party] plainly refers to [the other] writing." *Celaya v. Am. Pinnacle Mgmt. Servs.*, LLC, No. 3:13-CV-1096-D, 2013 WL 4603165 at *3 (N.D. Tex. Aug. 29, 2013) (citations omitted). The NERS refers to "the Dispute Resolution Agreement printed on the reverse side of this document, which is incorporated herein by reference." ECF No. 17 at 5. The agreement that Defendants claim is the "Dispute Resolution Agreement" (ECF No. 17 at 6) is not actually titled as such—instead, it is titled, "[ADRA]," and it is printed in a different font from the NERS. ECF No. 17 at 5-6. However, since the titles are sufficiently similar, and a change in font should not be decisive, the undersigned concludes that the NERS still "plainly refers" to the ADRA. Therefore, Swenson's argument that she never accepted the ADRA fails.

### 2. Defendants properly executed the 2006 Agreement.

A signature is not required to form a valid contract "[a]s long as the parties give their consent to the terms of the contract, and there is no evidence of an intent to require both signatures as a condition precedent to it becoming effective as a contract." *Huckaba*, 892 F.3d at 689 (internal citations and quotations omitted). Swenson, however, alleges that such evidence is present here.

She argues that because Defendants never signed the NERS, the parties did not properly execute and form an agreement to arbitrate. ECF No. 20 at 8-11, *Huckaba*, 892 F.3d. However, since there is some room for interpretation as to whether the blanks at issue in the instant contract form a signature block, and the Fifth Circuit in *Flores* counseled looking to context in cases of ambiguity, this argument ultimately fails, as well. 2023 WL 6533452, at *2.

In *Huckaba*, the Fifth Circuit explained that "whether a signature is required to bind the parties is a question of the parties' intent." 892 F.3d at 689. The arbitration agreement at issue in *Huckaba* contained:

> (1) a statement that "[b]y signing this agreement the parties are giving up any right they may have to sue each other;" (2) a clause prohibiting modifications unless they are "in writing and signed by all parties;" and (3) a signature block for the employer, Ref–Chem.

*Id.* at 689. Looking to these elements, the court found that a signature was required. *Id.* at 690.

The ADRA in the instant case contains virtually identical provisions to those in *Huckaba*. First, the ADRA states, "[b]y signing this Agreement, the parties are giving up any right they may have to sue each other." ECF No. 17 at 6. Second, the ADRA contains a clause prohibiting changes unless they are "in writing and signed by all parties." *Id*. Third, the ADRA contains blanks near the words, "Date received in Personnel" and "by." *Id*. But Defendants claim that "the [NERS] has a space to notate the date the on-boarding forms were received into a personnel file—not to counter-sign indic[a]ting the employers' acceptance." ECF No. 24 at 4.

In considering whether the ADRA fails for lack of a signature, the Court must look not only to *Huckaba*, but also to *Flores*, a more recent, though unpublished, Fifth Circuit case. In *Flores*, the Fifth Circuit found that "to make a signature a condition precedent to enforcement of a contract—including an arbitration agreement—the agreement must clearly and explicitly require a signature before it becomes binding." 2023 WL 6533452, at *1. A signature was not a condition

8

precedent in *Flores* because "[p]erhaps most importantly, there is no place for [the party now moving for arbitration] to sign the agreement. It contains no signature block at the end of the agreement for the company." *Id.* (citing *In re Bunzl USA, Inc.*, 155 S.W.3d 202, 211 (Tex. App.—El Paso 2004, orig. proceeding)). The Fifth Circuit also noted that "Flores has pointed to no Texas case in which a court has invalidated an agreement for lack of signature when there was no empty signature block." *Id*. In a footnote, the court also noted "that three peripheral clauses mention [the party moving for arbitration] signing the agreement" but distinguished them from the "core" of the agreement and ultimately looked not to these clauses, but to context, to determine that a signature was not required. *Id*. at *2 (unnumbered footnote).

Overall, if the blanks near the words, "Date received in Personnel" and "by," in the 2006 ADRA were clearly an empty signature block, the facts in the instant case would almost perfectly resemble *Huckaba*. If these blanks are not an empty signature block, then the court's decision in *Flores* is a better guide. 2003 WL 6533452, at *1. But since a contract must "clearly and explicitly require a signature" under *Flores*, the Court must consider the context of the agreement to determine whether it requires all parties to sign for the agreement to be valid. *Id.* at *1, *2.

Looking to context, Defendants argue that their own "enforcement of the Arbitration Agreement in their Motion evidences their assent to the Arbitration Agreement." ECF No. 24 at 5. Similarly, the court in *Flores* noted that the moving party sought to enforce the agreement against the employee "upon the filing of this suit." 2023 WL 6533452, at *2. Defendants also provided Swenson with the ADRA as part of her onboarding process, much as in *Flores*. *Id.*; ECF No. 17 at 3. Therefore, after considering the context of the agreement, the Court concludes that the ADRA did not require CCMH's signature to be enforceable.

Defendants, as the moving parties, have met their burden to "prove the existence of an agreement to arbitrate by a preponderance of the evidence." *Grant*, 469 F. App'x at 315. The burden then "shifts to the party opposing arbitration to demonstrate either that the agreement is invalid or, at a minimum, to allege the dispute is outside of the agreement's scope." *Id*. Swenson has not demonstrated that the agreement was not validly formed, and other validity issues are delegated to the arbitrator. ECF No. 17 at 6. Therefore, the Court now considers whether the dispute is outside the 2006 Agreement's scope.

### b.   The dispute falls within the scope of the 2006 Agreement.

Generally, a court, not the arbitrator, determines "whether the dispute falls within the scope of [the arbitration] agreement." *Flores*, 2023 WL 6533452, at *1. This is the second step of the Court's central analysis. *Id*. The ADRA does not delegate to the arbitrator the duty to determine the scope of the agreement. ECF No. 17 at 6. Therefore, the Court addresses the issue.

The Court presumes that the dispute falls within the agreement's scope "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Techs., Inc.*, v. *Commc'ns Workers of Am.*, 475 U.S. 643, 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). Broadly worded arbitration clauses fortify the presumption, which may be overcome by an "express provision excluding [the] particular grievance from arbitration" or by "only the most forceful evidence of a purpose to exclude the claim from arbitration." *Id.*

The scope of the ADRA is broadly worded and covers this employment dispute. It provides: "The Employer and the Employee whose signature is affixed hereto mutually recognize that there are many advantages to using mediation and arbitration to settle any and all legal disputes and claims, including, but not limited to, all those arising from or in the course of employment."

10

*Id*. The instant wrongful termination case arises "from or in the course of employment." *Id*. The ADRA applies to "any claim or dispute" related to a "statute," including "any [claims or disputes] related to allegations of violations of state or federal statutes related to discrimination." *Id*. Swenson alleges sex-based discrimination and retaliation under Title VII of the Civil Rights Act of 1964, a federal statute. ECF No. 1 at 11. Furthermore, Swenson does not appear to argue that the merits of this suit fall outside the scope of the 2006 Agreement. Therefore, the Court finds that the merits of this employment dispute fall within the scope of the 2006 Agreement.

### c. There is a valid delegation clause in the 2006 agreement, at least as to validity.

The 2006 Agreement delegates to the arbitrator "all disputes about the validity of the arbitration clause." ECF No. 17 at 6. Defendants point to this clause as part of the reason why all claims in this case should be arbitrated. ECF No. 16 at 7. Because the issue of delegation affects whether the arbitrator or the Court decides if the 2022 Agreement supersedes the 2006 Agreement, the Court determines if that clause is a valid delegation clause. *See Kubala*, 830 F.3d at 201-02.

"When considering whether there was a valid delegation, 'the court's analysis is limited.'" *Henry Schein*, 935 F.3d 274, 279 (internal citations and quotations omitted). "As always, [the court asks] if the parties entered into a valid agreement," as the Court did above. *Id*. "If they did, [the court turns] to the delegation clause and asks whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Id*.; *see also First Options of Chicago v. Kaplan,* 514 U.S. 938, 942 (1995) (defining arbitrability as "whether [the parties] agreed to arbitrate the merits"). In this context, the presumption is *against* agreeing to arbitrate arbitrability. "[C]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they

11

did so." *Henry Schein*, 935 F.3d at 279. However, "[i]f there is a valid delegation, the court must grant the motion to compel." *Id*.

Here, the ADRA explicitly "evinces an intent to have the arbitrator decide" the validity of the 2006 Agreement. *Id*.; ECF No. 17 at 6. Although the ADRA did not delegate issues involving the scope of the agreement to the arbitrator, it *did* delegate validity. ECF No. 17 at 6. "Whether a given claim must be arbitrated" (i.e., arbitrability) turns on the validity of the 2006 Agreement. *Henry Schein*, 935 F.3d at 279. Therefore, the 2006 Agreement delegates arbitrability to the arbitrator. *See Kubala*, 830 F.3d at 204 (arbitration clause delegating validity and other gateway issues to arbitrator was described as a valid delegation clause). The fact that the 2006 Agreement essentially delegates arbitrability to the arbitrator matters to how the Court should address who decides whether the 2022 Agreement supersedes the 2006 Agreement, as explained below.

> **d. Because of the valid delegation clause, the arbitrator should decide whether the 2022 Agreement supersedes the 2006 Agreement.**

Finally, the parties dispute whether the 2022 Agreement supersedes the 2006 Agreement. *See, e.g.* ECF No. 24 at 6-7. As Swenson notes (ECF No. 20 at 11-12), case law from Texas state courts indicates that courts, not arbitrators, should resolve this issue, even when arbitrability is delegated to the arbitrator. *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W. 3d 462, 480 (Tex. 2022) (in case involving earlier arbitration agreement delegating "gateway" issues to the arbitrator, writing that "[b]ecause the parties here dispute whether their arbitration agreement continued to exist after the 2012 settlement agreement, we agree with the trial court and court of appeals that courts must decide that issue.").

However, the Fifth Circuit and this Court have held that the arbitrator determines whether a later agreement supersedes an earlier one when the earlier agreement delegated arbitrability issues to the arbitrator. In *Agere*, the parties in an earlier agreement delegated the issue of

12

arbitrability to the arbitrator. *Agere Systems, Inc. v. Samsung Elecs. Co., Ltd*, 560 F.3d 337, 338 (5th Cir. 2009). The Fifth Circuit found that the arbitrator should decide whether a later agreement superseded an earlier agreement due to the "federal policy in favor of arbitration." *Id.* at 340; *see also BNSF Ry. Co. v. Alstom Transp.*, *Inc.*, No. 4:09-CV-740-Y, 2010 WL 11619686 at *4 (N.D. Tex. May 4, 2010) (citing *Agere* for the proposition that "[t]he issue of whether the arbitration clauses are still in effect is itself part of the arbitrability question and both sides have raised plausible arguments on the issue. Thus, the Court leaves the issue to the arbitrator.").

Whether the 2022 Agreement supersedes the 2006 Agreement is arguably a question of the 2006 Agreement's validity, rather than the 2006 Agreement's formation, and the 2006 Agreement delegates validity disputes to the arbitrator. ECF No. 17 at 6. Therefore, the arbitrator should determine whether the 2022 Agreement supersedes the 2006 Agreement. *See Henry Schein*, 139 S. Ct. at 529 ("When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.").

## IV.    CONCLUSION

Swenson's arguments about acceptance and execution of the 2006 Agreement fail, and her argument that the 2022 Agreement supersedes the 2006 Agreement should be addressed by the arbitrator. If the arbitrator determines that the 2022 Agreement supersedes the 2006 Agreement, litigation rather than arbitration of this case may ultimately be appropriate. The Court has some discretion as to whether to order a stay or a dismissal, and because of the uncertainty surrounding whether the 2022 Agreement supersedes the 2006 Agreement, the undersigned recommends that Judge O'Connor stay the case pending conclusion of arbitration and direct the clerk to administratively close the case. *See Ruiz v. Donahoe*, 784 F.3d 247, 249-50 (5th Cir. 2015) ("If a

dispute is subject to mandatory grievance and arbitration procedures, then the proper course of action is usually to stay the proceedings pending arbitration. However, a dismissal may be appropriate when all of the issues raised in the district court must be submitted to arbitration.").

Accordingly, the undersigned **RECOMMENDS** that Judge O'Connor **GRANT** Defendants Clay County Memorial Hospital's and Clay County Memorial Hospital Foundation's Opposed First Amended Motion to Compel Arbitration and Dismiss Litigation (As To Plaintiff's First Amended Complaint) (ECF No. 15) in **PART**, ordering a stay of litigation rather than dismissal.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

**SIGNED** on December 5, 2023.

_Hal R. Ray, Jr._
Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE